No. 24-5817

---

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

ANDREW PANDOLFI AND MANDI SHAWCROFT,

For Themselves, As Private Attorneys General, And On Behalf Of All Others Similarly Situated,

*Plaintiffs-Appellees*,

v.

AVIAGAMES, INC.; VICKIE YANJUAN CHEN; PING WANG; ACME, LLC; GALAXY DIGITAL CAPITAL MANAGEMENT, L.P.,

*Defendants-Appellants*.

---

On Appeal from the U.S. District Court for the Northern District of California, No. 3:23-cv-05971 (Hon. Edward M. Chen)

---

## BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS-APPELLANTS

---

Jennifer B. Dickey
Jonathan D. Urick
U.S. CHAMBER LITIGATION
   CENTER
1615 H Street, N.W.
Washington, DC 20062

Andrew J. Pincus
Archis A. Parasharami
Kevin S. Ranlett
Jennifer L. Weinberg
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006

*Counsel for* Amicus Curiae *the Chamber of Commerce of the United States of America*

**RULE 26.1 CORPORATE DISCLOSURE STATEMENT**

The Chamber of Commerce of the United States of America states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

# TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ........................ i

INTEREST OF THE AMICUS CURIAE .................................................. 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ................. 2

ARGUMENT ......................................................................................... 6

I.    The District Court Erred In Holding The Mass-Arbitration Procedures In AviaGames' Customer Agreement Unconscionable ............................................................................ 6

    A.    The District Court Failed To Consider The Benefits Of The Bellwether Approach. ................................................. 7

        1.    Consumers and businesses benefit from individual arbitration because their disputes can be efficiently addressed based on the merits ............... 8

        2.    Mass arbitrations are frequently vehicles for abuse ....................................................................... 9

        3.    Arbitrating bellwether cases ensures merits-based resolutions of mass arbitrations, preserving the benefits of arbitration for all parties. ................... 18

    B.    The District Court's Other Criticisms Of Resolving Mass Arbitrations Through Staged Proceedings Are Without Merit ................................................................. 25

        1.    The bellwether process does not unduly delay resolution ................................................................. 25

        2.    The bellwether provision's lack of mutuality is not unconscionable. .................................................. 28

    C.    The FAA Preempts Plaintiffs' Unconscionability Challenge ................................................................... 29

II.    The Bellwether Clause Does Not Offend *Heckman* ...................... 30

    A.    *Heckman*'s Unconscionability Holding Is Wholly Distinguishable. ................................................... 30

    B.    The Bellwether Provision Is Compatible With *Heckman*'s Alternative Holding ..................................... 33

CONCLUSION ...................................................................... 35

CERTIFICATE OF COMPLIANCE ...................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abernathy v. DoorDash, Inc.*,
   438 F. Supp. 3d 1062 (N.D. Cal. 2020) ................................. 14

*Aggarwal v. Coinbase*,
   685 F. Supp. 3d 867 (N.D. Cal. 2023) .................................. 25

*Allied-Bruce Terminix Cos. v. Dobson*,
   513 U.S. 265 (1995) ......................................................... 9, 28

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011) ..................................... 2, 28, 29, 30, 34

*Bernal v. Kohl's Corp.*,
   __ F. Supp. 3d __, 2024 WL 4337452 (E.D. Wis. Sept. 13,
   2024) ............................................................................... 12

*Briggs v. Merck Sharp & Dohme*,
   796 F.3d 1038 (9th Cir. 2015) ............................................ 21

*Brooks v. WarnerMedia Direct, LLC*,
   2024 WL 3330305 (S.D.N.Y. July 8, 2024) .......................... 24

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
   2020 WL 3513547 (D. Minn. June 29, 2020) ........................ 14

*Discover Bank v. Super. Ct.*,
   113 P.3d 1100 (Cal. 2005) ............................................ 33, 34

*Epic Sys. Corp. v. Lewis*,
   584 U.S. 497 (2018) ........................................................ 4, 28

*Fishon v. Peloton Interactive, Inc.*,
   336 F.R.D. 67 (S.D.N.Y. 2020) .......................................... 15

*George v. eBay, Inc.*,
   71 Cal. App. 5th 620 (2021) ............................................ 7, 24

iv

*Green Tree Fin. Corp.-Alabama v. Randolph*,
　531 U.S. 79 (2000).................................................................. 26

*In re Hanford Nuclear Reservation Litig.*,
　534 F.3d 986 (9th Cir. 2008)................................................ 20

*Heckman v. Live Nation Entertainment, Inc.*,
　120 F.4th 670 (9th Cir. 2024) .............................4, 5, 30, 31, 32, 33, 34

*Hohenshelt v. Super. Ct.*,
　549 P3d. 143 (Cal. 2024)....................................................... 16

*Intuit Inc. v. 9,933 Individuals*,
　2021 WL 3204816 (Cal. Ct. App. July 29, 2021) ................ 12

*Kindred Nursing Ctrs. Ltd. P'ship v. Clark*,
　581 U.S. 251 (2017)......................................................... 3, 29

*Lamps Plus, Inc. v. Varela*,
　587 U.S. 176 (2019)............................................................... 34

*Lim v. Tforce Logistics, LLC*,
　8 F.4th 992 (9th Cir. 2021) ................................................. 25

*MacClelland v. Cellco P'ship*,
　609 F. Supp. 3d 1024 (N.D. Cal. 2022)............................... 24

*Nieves v. City of Cleveland*,
　153 F. App'x 349 (6th Cir. 2005)......................................... 15

*Oblix, Inc. v. Winiecki*,
　374 F.3d 488 (7th Cir. 2004)................................................ 29

*OTO, L.L.C. v. Kho*,
　447 P.3d 680 (Cal. 2019)................................................. 7, 22

*Perry v. Thomas*,
　482 U.S. 483 (1987)................................................................. 3

*Ruiz v. CarMax Auto Superstores, Inc.*,
　2024 WL 1136332 (C.D. Cal. Jan. 18, 2024) ................. 23, 24

*S. Leasing Partners, Ltd. v. McMullan*,
  801 F.2d 783 (5th Cir. 1986)..................................................15

*Sanchez v. Valencia Holding Co., LLC*,
  353 P.3d 741 (Cal. 2015)......................................................28

*Scott v. AT&T Inc.*,
  2021 WL 2839959 (N.D. Cal. Feb. 16, 2021)......................................32

*Surkhabi v. Tesla, Inc.*,
  2022 WL 19569540 (C.D. Cal. Oct. 27, 2022)...................................32

*Wallrich v. Samsung Elecs. Am., Inc.*,
  691 F. Supp. 3d 867 (N.D. Ill. 2023)............................................12, 14

*Wallrich v. Samsung Elecs. Am., Inc.*,
  106 F.4th 609 (7th Cir. 2024).................................................12, 14

*Weatherbee v. Va. State Bar ex rel. Fourth Dist.-Section I
  Comm.*,
  689 S.E.2d 753 (Va. 2010)......................................................15

## Statutes and Rules

Federal Arbitration Act,
  9 U.S.C. §§ 1-16....................................................................1

  9 U.S.C. § 2.........................................................................3

Cal. Civ. Code § 1670.5(b) ........................................................7, 9

Cal. Civ. Proc. Code § 1281.97 .................................................15, 16

Cal. Civ. Proc. Code § 1281.98 .................................................15, 16

Cal. Civ. Proc. Code § 1281.99 .................................................15, 16

Fed. R. App. P. 29(a)(4)(E) .......................................................1

Fed. R. Civ. P. 11 ................................................................13

Cal. R. Ct. 3.501-50 ..............................................................29

vi

**Other Authorities**

AAA, Commercial Arbitration Rules and Mediation
Procedures (Sept. 1, 2022), https://bit.ly/3Pgs6pJ ............................ 32

AAA, Consumer Arbitration Rules: Cost of Arbitration (Jan.
1, 2023), https://bit.ly/4jiCBqt ...................................................... 10, 11

AAA, Consumer Arbitration Rules (Sept. 1, 2020),
https://bit.ly/3Pgs6pJ ...................................................................... 31

AAA, Consumer Mass Arbitration and Mediation Fee
Schedule: Costs of Arbitration and Mediation (Jan. 15,
2024) , https://bit.ly/41VVMjH .................................................... 10, 15

AAA, Mass Arbitration Supplementary Rules (Apr. 1, 2024) ,
https://bit.ly/3WnnWAq ................................................................ 11, 27

ABA Model R. of Prof. Conduct 1.4 ........................................................ 13

ABA Model R. of Prof. Conduct 3.1 cmt. 2 ............................................. 13

Hon. Stephen R. Bough & Anne E. Case-Halferty, *A Judicial
Perspective on Approaches to MDL Settlement*, 89 UMKC
L. Rev. 971 (2021) ................................................................................ 22

Hon. Eldon E. Fallon, *Bellwether Trials in Multidistrict
Litigation*, 82 Tul. L. Rev. 2323 (2008) ............................................. 20

Alison Frankel, *Intuit Defends $40 Million Class Settlement,
Attacks Mass Arbitration Firm*, Reuters (Dec. 9, 2020),
https://reut.rs/3eU2vV0 ....................................................................... 12

Henry J. Friendly, *Federal Jurisdiction: A General View*
(1973).................................................................................................... 17

J. Maria Glover, *Mass Arbitration*, 74 Stan. L. Rev. 1283
(2022).................................................................................................... 17

Matthew C. Helland, *Costs of Defense in Mass Individual
Wage-and-Hour Arbitrations: A Case Study*, PLI Current
Vol. 3, No. 1 (Winter 2019) ................................................................ 27

*Manual for Complex Litigation, Fourth* (2004) ...................................... 21

NYU Center on Civil Justice, *What the Data Show: Mapping Trends in Multidistrict Litigation* (Sept. 2015), https://bit.ly/3zoDwAp ........................................................................ 21

Nam D. Pham & Mary Donovan, *Fairer, Faster, Better III: An Empirical Assessment of Consumer & Employment Arbitration*, U.S. Chamber of Commerce Institute for Legal Reform 4 (Mar. 2022) ................................................................. 8

7 Harry M. Reasoner, *et al.*, *Business & Commercial Litigation in Federal Courts* (5th ed. Supp. 2021) ........................... 13

Amanda Robert, *Amazon Drops Arbitration Requirement After Facing 75,000 Demands*, ABA J. (June 2, 2021), https://bit.ly/3URJuTj ............................................................ 12, 18, 20

U.S. Chamber of Commerce Institute for Legal Reform, *Mass Arbitration Shakedown: Coercing Unjustified Settlements* (Feb. 2023), https://bit.ly/3qTzu1q ................................................ 10, 15

U.S. Judicial Panel on Multidistrict Litigation, *Statistical Analysis of Multidistrict Litigation Under 28 U.S.C. § 1407 Fiscal Year 2021* (2021), https://bit.ly/3feso28 ...................... 21

Stephen J. Ware, *The Centrist Case for Enforcing Adhesive Arbitration Agreements*, 23 Harv. Negotiation L. Rev. 29 (2017) ................................................................................................ 9

Andrew Wallender, *Uber Settles 'Majority' of Arbitrations for at Least $146M*, Bloomberg Law (May 9, 2019), https://bit.ly/3z5E0LD ........................................................................ 12

## INTEREST OF THE *AMICUS CURIAE*[1]

The Chamber of Commerce of the United States of America is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community, such as the enforceability of arbitration agreements and interpretation of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16.

Many of the Chamber's members and affiliates regularly rely on arbitration agreements. Arbitration is speedy, fair, inexpensive, and less adversarial than litigation in court. The Chamber's members and

---

[1]  No counsel for a party authored this brief in whole or in part, and no person or entity, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E). All parties consented to the filing of this brief.

1

affiliates have structured millions of contractual relationships around the use of arbitration precisely to achieve those benefits.

The ruling below threatens the availability of those benefits because it deprives businesses of the ability to protect themselves as well as their customers and workers from abusive mass arbitrations and blackmail settlements. The court below disregarded the legitimate need to adopt safeguards against these abuses, such as bellwether provisions, to ensure that arbitration remains a viable method of resolving individual claims fairly and on the merits. Without these safeguards, businesses will be discouraged from using arbitration altogether, frustrating the purposes of the FAA and harming businesses, their customers, and employees. Accordingly, the Chamber has a strong interest in this case and in reversal of the judgment below.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The FAA was enacted to afford "parties discretion in designing arbitration processes" that are "tailored to the type of dispute" and to "ensure the enforcement of arbitration agreements according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344-45 (2011). Accordingly, the FAA declares arbitration agreements "valid, irrevocable,

2

and enforceable, save upon such grounds as exist at law or in equity for the revocation of *any* contract." 9 U.S.C. § 2 (emphasis added). This "equal footing" principle "preempts any state rule discriminating on its face against arbitration" or that seeks to "accomplish[] the same objective" more "covertly." *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 581 U.S. 251, 254 (2017). An example of such covert discrimination is such as a purportedly neutral rule that applies to arbitration agreements "in a manner different from that" of "nonarbitration agreements." *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987)).

Here, the district court misapplied California law—and thus contravened the FAA—in holding that AviaGames's arbitration agreement is unconscionable. The court condemned the agreement's use of staged, bellwether-style proceedings to facilitate global resolutions of mass arbitrations. But the court ignored the sound reasons supporting the use of a bellwether process—something that is commonplace in federal courts.

Mass arbitrations are often a tool for abuse, designed to extract blackmail settlements because the arbitration fees the defendant business must pay if all cases are simultaneously initiated often make it

3

too costly to mount a defense on the merits. The rise of mass arbitration therefore imposes serious risks to the continued viability of individual arbitration, the form of arbitration that the FAA "seems to protect pretty absolutely." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 506 (2018).

Many businesses, including AviaGames, have begun to use a bellwether process to prevent mass-arbitration abuse. This method of handling mass individual claims is fair, and commonly used in federal courts in the mass-tort and multidistrict-litigation ("MDL") contexts. AviaGames's arbitration process, like that of other companies, simply borrows this procedure from the federal courts. Because there is nothing unconscionable about that procedure, the district court not only misapplied California law in deviating from California's generally applicable unconscionability principles, but also violated the FAA by applying an arbitration-specific unconscionability standard.

As AviaGames has anticipated in its brief (at 62-64), plaintiffs may seek to defend the district court's decision on alternative grounds, invoking *Heckman v. Live Nation Entertainment, Inc.*, 120 F.4th 670 (9th Cir. 2024). The Live Nation arbitration provisions held unconscionable in *Heckman* did involve procedures applicable to mass arbitrations. But

4

that is where the similarities to this case end. The clause in *Heckman* adopted the unique rules of a new arbitration administrator, New Era. According to the *Heckman* court, New Era's rules allowed adjudication of mass arbitrations through representative proceedings deemed binding on non-party claimants despite their inability to participate in the precedential proceeding or to opt out. The AviaGames clause does not select New Era as the arbitration provider and the mass-arbitration procedures contain none of the problematic features at issue in the *Heckman* clause. For example, AviaGames uses bellwether cases to inform global settlement discussions, but the results *are not binding* on other claimants. Nor does AviaGames's arbitration clause mandate the use of "aggregative arbitration"—which the *Heckman* court determined, in the context of Live Nation's arbitration provision and New Era's rules, falls outside the scope of the FAA's protections. *Id.* at 690. In short, Plaintiffs cannot salvage the ruling below by resort to *Heckman*.

      This Court should reverse the district court's order.

# ARGUMENT

## I. The District Court Erred In Holding The Mass-Arbitration Procedures In AviaGames's Customer Agreement Unconscionable.

This Court should reverse the ruling below holding that AviaGames's mass-arbitration clause is unconscionable. Under that clause, if the same or coordinated counsel bring 25 or more similar claims, the arbitrations are staged so that 20 cases at a time may be filed in arbitration and resolved in separate proceedings. 3-ER-402 (2022 Terms of Service); 3-ER-432 (2023 Terms of Service). This process replicates what federal courts do when facing MDLs with large numbers of individual claims. Yet the district court failed to consider that parallel or the benefits of this approach. Indeed, this bellwether clause would facilitate the orderly resolution of mass arbitrations through informed settlements, while preventing some of the abuses that have become prevalent in mass arbitrations in recent years. AviaGames's clause therefore could be deemed unconscionable only by distorting California's law of unconscionability to disfavor arbitration—which the FAA prohibits.

6

### A. The District Court Failed To Consider The Benefits Of The Bellwether Approach.

Under California law, assessing substantive unconscionability "requires inquiry into the 'commercial setting, purpose, and effect' of the contract or contract provision" in question. *George v. eBay, Inc.*, 71 Cal. App. 5th 620, 630 (2021) (quoting Cal. Civ. Code § 1670.5(b)). A court must "examine the totality of the agreement's substantive terms" and determine the fairness of the parties' "overall bargain." *OTO, L.L.C. v. Kho*, 447 P.3d 680, 689 (Cal. 2019). The district court did not meaningfully engage in this inquiry, failing entirely to consider the commercial reasonableness of AviaGames's bellwether clause.

That was error. Under a proper application of California's substantive unconscionability standard, the benefits of the bellwether process to all parties are evident: it preserves individualized arbitration by ensuring that parties—on both sides—have a fair opportunity to be heard on the merits while encouraging an orderly process. The district court improperly ignored these benefits.

7

### 1. Consumers and businesses benefit from individual arbitration because their disputes can be efficiently addressed based on the merits.

For consumers and employees, individual arbitration is a faster, simpler, and less expensive method of dispute resolution than a lawsuit in court. If a claim doesn't immediately settle, individuals who arbitrate can actually get rulings on the merits of their claims—as opposed to individuals who must go to court and find themselves tripped up by pleading technicalities or shut out entirely by the complexities, expense, and delay of the judicial system. Indeed, studies consistently demonstrate that consumers and employees who arbitrate fare better than those who litigate: they win more often and their awards are greater.[2] As then Justice Breyer concluded, arbitration is especially important for individuals with modest claims—abandoning arbitration would "leav[e] the typical consumer who has only a small damages claim (who seeks, say, the value of only a defective refrigerator or television

---

[2] *See, e.g.*, Nam D. Pham & Mary Donovan, *Fairer, Faster, Better III: An Empirical Assessment of Consumer & Employment Arbitration*, U.S. Chamber of Commerce Institute for Legal Reform 4 (Mar. 2022), https://bit.ly/3SK7QwA (finding that, on average, arbitration leads to faster resolution of claims than litigation, with consumers and employees enjoying higher win rates and obtaining higher average damages in arbitration than litigation).

set) without any remedy but a court remedy, the costs and delays of which could eat up the value of an eventual small recovery." *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 281 (1995).

Businesses benefit as well. Because arbitration reduces the cost of dispute resolution, it also reduces the company's overall cost of doing business. The forces of market competition then cause those savings to be passed along to consumers in the form of lower prices and to employees in the form of higher wages.[3]

### 2. Mass arbitrations are frequently vehicles for abuse.

The district court also failed to consider a key aspect of the "commercial setting, purpose, and effect" of the parties' arbitration agreement, Cal. Civ. Code § 1670.5(b)—the rise of the abusive mass arbitrations threatening the viability of individual arbitration.

In recent years, some plaintiffs' lawyers have sought to subvert consumer-friendly arbitration provisions as a means of extracting

---

[3] Stephen J. Ware, *The Centrist Case for Enforcing Adhesive Arbitration Agreements*, 23 Harv. Negotiation L. Rev. 29, 85, 113 (2017) ("[S]tandard economic analysis suggests that enforcement of adhesive consumer arbitration agreements tends over time to lower the prices of the goods and services consumers buy.").

9

settlements from businesses. *See generally* U.S. Chamber of Commerce Institute for Legal Reform, *Mass Arbitration Shakedown: Coercing Unjustified Settlements* 37 (Feb. 2023), https://bit.ly/3qTzu1q.[4] These lawyers create coercive settlement leverage based not on the merits of the threatened claims, but based only on the fact that many businesses—like AviaGames—agree to pay most (if not all) costs associated with arbitration.[5]

For example, under the current fee schedule of the largest arbitration provider, the American Arbitration Association (AAA), if a mass arbitration is filed, the business must pay a variety of fees. First, the business must immediately pay an initiation fee of $8,125—a modest amount.[6] But then, for each case filed, the business must pay

---

[4] This white paper regarding mass arbitration was authored by some of the lawyers submitting this brief.

[5] Since 2022, AviaGames's terms expressly provide that: "For any arbitration you initiate, you will pay the consumer filing fee, and Aviagames will pay the remaining AAA fees and costs." 3-ER-402.

[6] AAA, Consumer Mass Arbitration and Mediation Fee Schedule: Costs of Arbitration and Mediation (Jan. 15, 2024), https://bit.ly/41VVMjH ("*2024 Fee Schedule*"). The AAA fee schedule in effect in 2023 when Plaintiffs accepted AviaGames's Terms had a fee schedule that imposed even higher upfront arbitration fees of between $3,000 to $4,225 per case. *See* AAA, Consumer Arbitration Rules: Cost of Arbitration (Jan. 1, 2023), https://bit.ly/4jiCBqt.

administrative fees that are between $1,150 and $1,525, as well as additional amounts for the arbitrators' time.[7]

Consider the consequences if a company were faced with 50,000 arbitrations. Under the AAA's fee schedule, the AAA administrative fees would be about $57.9 million.[8] And a substantial portion of those fees must be paid soon after the cases are filed; moreover, deposits against the arbitrators' anticipated time are extra, and could add up to many millions in additional fees for the business.[9] This upfront amount could be due before the company can even determine whether each claimant is actually a customer, much less investigate the underlying claims. And the company would be required to pay this amount even if it goes on to win every case.

---

[7] *See 2024 Fee Schedule*, *supra*.

[8] Specifically, this amount represents the $8,125 initiation fee, $5,375,000 in "per case" fees, $22,500,000 in arbitrator-appointment fees, and $30,000,000 in "final fees." *See 2024 Fee Schedule*, *supra*.

[9] The initiation fee is charged immediately upon filing, the per-case fees are charged when the cases are accepted for administration and allowed to proceed, and the arbitrator-appointment fees are charged as soon as 45 days after the filing requirements are met, when arbitrator selection begins. *See id.*; *see also* AAA, Mass Arbitration Supplementary Rules (Apr. 1, 2024), https://bit.ly/3WnnWAq.

11

A threat of 50,000 arbitrations is not merely hypothetical. Businesses have recently faced threats of similarly large mass arbitrations, including Samsung (50,000),[10] Kohls (55,000),[11] Uber (60,000),[12] Amazon (75,000),[13] and Intuit (125,000).[14]

All too often, the purpose of aggregating this large number of cases is to push the arbitration fees to astronomical levels, and thereby create leverage to force blackmail settlements, regardless of the merits of the claims. And the manner in which mass arbitrations are assembled—typically by using social media advertisements to amass claimants—greatly increases the risk that the underlying claims are meritless.

---

[10] *Wallrich v. Samsung Elecs. Am., Inc.*, 691 F. Supp. 3d 867, 872 (N.D. Ill. 2023), *rev'd*, 106 F.4th 609 (7th Cir. 2024).

[11] *Bernal v. Kohl's Corp.*, __ F. Supp. 3d __, 2024 WL 4337452, at *1 (E.D. Wis. Sept. 13, 2024), *appeal docketed*, No. 24-2806 (7th Cir. Oct. 10, 2024).

[12] Andrew Wallender, *Uber Settles 'Majority' of Arbitrations for at Least $146M*, Bloomberg Law (May 9, 2019), https://bit.ly/3z5E0LD.

[13] Amanda Robert, *Amazon Drops Arbitration Requirement After Facing 75,000 Demands*, ABA J. (June 2, 2021), https://bit.ly/3URJuTj.

[14] Alison Frankel, *Intuit Defends $40 Million Class Settlement, Attacks Mass Arbitration Firm*, Reuters (Dec. 9, 2020), https://reut.rs/3eU2vV0; *see also Intuit Inc. v. 9,933 Individuals*, 2021 WL 3204816, at *2 (Cal. Ct. App. July 29, 2021).

Unlike class actions, where plaintiffs' lawyers predominantly communicate with a few named plaintiffs to initiate a case, and the court-supervised class certification process provides some guarantees about the characteristics of unnamed class members, mass arbitrations require plaintiffs' lawyers to engage in individualized vetting for each arbitration claim that they file. Plaintiffs' lawyers *should* be vetting their clients to ensure that they have a basis for presenting an arbitral claim and communicating with their clients throughout the process—indeed, those steps are mandated by rules of professional conduct.[15]

But recent experience suggests that these requirements are not being met. For example, the Seventh Circuit recently reversed an order compelling Samsung to participate in a mass arbitration because the plaintiffs had failed to introduce any evidence that the claimants were

---

[15] *See, e.g.*, ABA Model R. of Prof. Conduct 3.1 cmt. 2 ("The filing of an action . . . or similar action taken for a client" requires lawyers to "inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good faith arguments in support of their clients' positions."); 7 Harry M. Reasoner, *et al.*, *Business & Commercial Litigation in Federal Courts* § 85.14 (5th ed. Supp. 2021) ("Like Fed. R. Civ. P. 11, Model Rule 3.1 and analogous state rules generally impose a duty of investigation on the lawyer."); *see also* ABA Model R. of Prof. Conduct 1.4 (requiring lawyer to communicate and consult with client).

even Samsung customers. *See Wallrich*, 106 F.4th at 619. And in a recent mass arbitration against Wells Fargo, a process arbitrator dismissed 89% of claimants because plaintiffs' counsel could not attest, after more than a year, that they were actual Wells Fargo customers with the account feature at issue who incurred the relevant fee within the claim's statute of limitations.[16]

Other companies targeted by mass arbitrations have had similar experiences.[17] This pattern confirms that plaintiffs' lawyers cannot

---

[16] *See* Decl. of Alicia Baiardo ¶¶ 31-37, Dkt. 21, & Exs. 45-54, Dkt. 21-2, *Penuela v. Wells Fargo & Co.*, 24-cv-766 (N.D. Cal. May 28, 2024) (attaching claimants' submission and process arbitrator's order).

[17] In cases involving mass arbitrations, companies have repeatedly reported (with supporting evidence) that many claimants are illegitimate. *See, e.g.*, Decl. of Roger Cole ¶¶ 21-22, *In re Intuit Free File Litig.*, No. 19-cv-2546 (N.D. Cal. Dec. 7, 2020), Dkt. 192 (noting that claimants' counsel withdrew 8,282 arbitrations after defendant demonstrated that the claimants were either not customers or never paid the disputed fee); *In re CenturyLink Sales Pracs. & Sec. Litig.*, 2020 WL 3513547, at *2-3 (D. Minn. June 29, 2020) (reporting that the defendant "could not identify any potential customer account that could be connected with some" arbitration claimants, with some even "claimed to receive services at addresses in states in which [the defendant] does not provide services"); *Abernathy v. DoorDash, Inc.*, 438 F. Supp. 3d 1062, 1065 (N.D. Cal. 2020) (determining that 869 arbitration claimants had failed to provide sufficient evidence to allow the court to find that they had arbitration agreements with the defendant). And a Chamber white paper authored by some of the counsel submitting this brief found that some businesses report that as many as 90% or more of mass-arbitration

blindly trust the unverified information typed into online forms by strangers recruited to be arbitration claimants.[18]

Nor can businesses simply refuse to pay the fees. The AAA, for example, warns that if a business fails to timely pay an invoice, the AAA "may decline to administer future consumer arbitrations with that business."[19] The nonpayment of fees thus could end the company's arbitration program.[20] And in California, Civil Procedure Code Sections

---

claimants were either not customers or never subjected to the challenged practice or fee. *Mass Arbitration Shakedown: Coercing Unjustified Settlements*, *supra*, at 37.

[18] *See, e.g.*, *Nieves v. City of Cleveland*, 153 F. App'x 349, 353 (6th Cir. 2005) (affirming sanctions imposed on lawyer who "did not do any reasonable investigation to establish the truth of [his client's] claims, but only blindly relied on his client's accusations"); *S. Leasing Partners, Ltd. v. McMullan*, 801 F.2d 783, 788 (5th Cir. 1986) ("Blind reliance on the client is seldom a sufficient inquiry" under Rule 11), *overruled in part on other grounds by Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866 (5th Cir. 1988) (en banc); *Weatherbee v. Va. State Bar ex rel. Fourth Dist.- Section I Comm.*, 689 S.E.2d 753, 756 (Va. 2010) (lawyer violated Rule 3.1 by filing "form complaints without undertaking a reasonable inquiry into their validity with respect to a particular client").

[19] AAA, *Consumer Mass Arbitration and Mediation Fee Schedule: Costs of Arbitration and Mediation*, *supra*.

[20] *See Fishon v. Peloton Interactive, Inc.*, 336 F.R.D. 67, 68 (S.D.N.Y. 2020) (noting AAA's refusal to administer future arbitrations for Peloton after it failed to pay AAA fees).

1281.97-99 threaten businesses with harsh sanctions if they fail to pay arbitral fees within 30 days.[21]

Plaintiffs' law firms have exploited these dynamics to try to achieve quick settlements that often are lucrative for plaintiffs' counsel. After all, a business facing the threat of over $58 million in AAA fees may find it difficult to reject (say) a $20 million settlement demand, even if the underlying claims are meritless. Unsurprisingly, given these realities, mass arbitrations have proliferated in recent years.

---

[21] Under California law, if a "drafting party" to an "employment or consumer arbitration" agreement fails to pay the arbitration fees owed under that agreement "within 30 days" of the invoice, the drafting party is in "default" of the agreement as a matter of law. Cal. Civ. Proc. Code § 1281.97. This default entitles the plaintiff consumer or employee either to (1) "[w]ithdraw the claim from arbitration and proceed in a court of appropriate jurisdiction," in which case "the court shall impose sanctions on the drafting party"; or (2) "[c]ompel arbitration in which [case] the drafting party shall pay reasonable attorney's fees and costs related to the arbitration." *Id.*; *see also id.* §§ 1281.98 & 1281.99.

The U.S. Chamber has elsewhere explained why this rule, which imposes special penalties on arbitration agreements as compared to other contractual agreements, violates the FAA. *See* Amicus Curiae Br. of the Chamber of Commerce of the United States in Supp. of Pls.-Appellants 15-30, *Intuit Inc. v. 9,933 Individuals*, No. B308417 (Cal. Ct. App. Mar. 19, 2021). The California Supreme Court is currently considering the preemption issue. *See Hohenshelt v. Super. Ct.*, 549 P3d. 143 (Cal. 2024).

16

Nearly a half-century ago, Judge Friendly famously recognized that class actions can lead to "blackmail settlements."[22] Today, for plaintiffs' firms threatening mass arbitrations, blackmail settlements are the entire point. One law professor has stated candidly—after interviewing plaintiffs' lawyers who originated the mass-arbitration strategy—that "[t]he mass-arbitration model operates on its ability to impose significant *in terrorem* settlement pressure" through the imposition of "astounding" fees that "can spell financial catastrophe for a potential defendant."[23] The professor concluded that the settlement pressure imposed by a mass arbitration—even one asserting "more dubious claims"—can be greater than that imposed by a certified class action.[24]

Companies dealing with a mass arbitration thus face a Hobson's choice: either pay the overwhelming bill for arbitration fees in order to have an opportunity to investigate and defend against the claims on the

---

[22]  Henry J. Friendly, *Federal Jurisdiction: A General View* 120 (1973).

[23]  J. Maria Glover, *Mass Arbitration*, 74 Stan. L. Rev. 1283, 1345, 1349, 1380 (2022).

[24]  Glover, 74 Stan. L. Rev. at 1350; *see also id*. at 1352 ("Simply put, mass arbitration shows that when it comes to *in terrorem* effects (the bogeyman of the class-action counterrevolution), the leverage of a large number of individual arbitrations can sometimes exceed the leverage created by aggregate proceedings.").

merits, or accept under duress a settlement that reflects the AAA fees rather than the merits of the claims. The cost of these blackmail settlements thus amounts to, in effect, a mass-arbitration tax on businesses. Some, like Amazon, which faced more than 75,000 arbitration demands in 2021, have responded by abandoning their arbitration clauses and thus the benefits of arbitration for dispute resolution. Amanda Robert, *Amazon Drops Arbitration Requirement After Facing 75,000 Demands*, ABA J. (June 2, 2021), https://bit.ly/3URJuTj. None of these results are desirable.

### 3. Arbitrating bellwether cases ensures merits-based resolutions of mass arbitrations, preserving the benefits of arbitration for all parties.

Faced with the rise of abusive mass arbitrations, many businesses—including AviaGames—have updated their agreements to provide for the use of staged, bellwether proceedings for mass arbitrations. The district court failed to recognize the real-world problem being addressed. Nor did the court appreciate that this bellwether approach enables parties to resolve mass-arbitration claims based on actual arbitration resolutions of some of the claims rather than a coerced settlement reflecting merely the threatened aggregated arbitration fees.

18

An arbitral bellwether process benefits all parties. The process ensures that the disputes chosen as test cases will be resolved on the merits, while (just as in MDL courts) the remaining cases are held in abeyance. This process defers the assessment of virtually all of the arbitration fees in the non-bellwether cases until each tranche of bellwether cases is actually arbitrated.[25] Businesses benefit because it is feasible to defend mass-arbitration claims on the merits in tranches of bellwethers. And customers with mass-arbitration claims get to have resolutions based on the merits—either because they are a bellwether claimant or because, by getting to see the results in bellwether cases, they can reach informed settlements of their claims. Moreover, by removing the threat of immediate, multimillion-dollar arbitration fees, the bellwether clause ensures that blackmail settlements cannot be foisted on defendants, regardless of the merits of the claims.

The bellwether process for administering large numbers of individual arbitrations is modeled on the approach used by MDL courts

---

[25] Additionally, the customers face no threat to their right to arbitrate their claims: all cases not selected for the initial round of bellwether proceedings are tolled for statute-of-limitations purposes and are thus preserved. 3-ER-403 (2022 Terms of Service); 3-ER-433 (2023 Terms of Service).

to resolve large numbers of individual lawsuits—*i.e.*, to provide for bellwether trials designed to inform the parties about whether and how to settle the claims. Although bellwether trials are also not impervious to abuse, one federal judge has described such trials as "one of the most innovative and useful techniques for the resolution of complex cases." Hon. Eldon E. Fallon, *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323, 2323 (2008).

Under the MDL process, representative cases are selected from the numerous cases in the MDL and set for trial. Fallon, 82 Tul. L. Rev. at 2340-41. The outcome of the bellwether trials then encourages settlement in two ways. First, by requiring preparation for trial, the process forces litigants to take a more realistic assessment of what evidence and arguments they can present. *Id.* at 2341-42. Second, the outcome of the trials provides "real-world evaluations of the litigation by multiple juries." *Id.* at 2325.

This Court has recognized the benefits of MDL bellwethers. Although bellwethers cannot force a global settlement, they are "designed to produce a verdict that would highlight the strengths and weaknesses of the parties' respective cases" and thereby "promote

[global] settlement." *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 995 (9th Cir. 2008); *see also, e.g., Briggs v. Merck Sharp & Dohme*, 796 F.3d 1038, 1051 (9th Cir. 2015) ("[a] bellwether trial is a test case that is typically used to facilitate settlement in similar cases").

In practice, MDLs—and the judges overseeing them—have proven to be remarkably effective at achieving settlements. Since 1968, when Congress passed the MDL statute, transferee courts have remanded back to the originating courts fewer than 3% of all cases consolidated into an MDL, which means that transferor courts terminated 97% of cases themselves.[26]

A study by the NYU School of Law Center on Civil Justice determined that between 2000 and 2015, 72% of the MDL case terminations resulted from settlement. NYU Center on Civil Justice, *What the Data Show: Mapping Trends in Multidistrict Litigation* (Sept. 2015), https://bit.ly/3zoDwAp; *see also Manual for Complex Litigation, Fourth* § 20.132 (2004) ("Few cases are remanded for trial; most

---

[26] *See* U.S. Judicial Panel on Multidistrict Litigation, *Statistical Analysis of Multidistrict Litigation Under 28 U.S.C. § 1407 Fiscal Year 2021* at 3 (2021), https://bit.ly/3feso28 ("Since the creation of the Panel in 1968, . . . a total of 17,357 actions have been remanded for trial and 647,396 actions have been terminated in the transferee court.").

multidistrict litigation is settled in the transferee court."). As one expert in the MDL process has observed, "nothing encourages global MDL settlement like setting bellwether trials." Hon. Stephen R. Bough & Anne E. Case-Halferty, *A Judicial Perspective on Approaches to MDL Settlement*, 89 UMKC L. Rev. 971, 976 (2021) (quoting Special Master David Cohen).

AviaGames's bellwether clause adapts this MDL approach for mass arbitration. Borrowing from federal court procedures cannot be so "'overly harsh' or 'one-sided'" as to be unconscionable. *OTO*, 447 P.3d at 690 (citation omitted). To the contrary, courts have recognized the benefits of bellwether proceedings in promoting fairness and orderly resolution of claims.

Take, for example, the recent lawsuit by Tubi against the Keller Postman law firm over whether the firm had improperly filed over 23,500 allegedly unvetted arbitrations and thereby tortiously interfered with Tubi's contracts with the claimants.[27] Even though Tubi's agreement did not require the use of bellwether proceedings, to "actually get things

---

[27] *See, e.g.*, Compl. *Tubi, Inc., v. Keller Postman LLC*, No. 24-cv-01616 (D.D.C. May 31, 2024), ECF 1.

moving" toward a resolution, the district court urged the parties to arbitrate—not all the cases, but "5 to 10" "bellwether arbitrations." Tr. 38, 40, *Tubi, Inc., v. Keller Postman LLC*, 1:24-cv-01616 (D.D.C. Dec. 19, 2024). Given the court's urging, the parties conferred over next steps, and about an hour later, agreed to just that (*id.* at 43-47)—because bellwether proceedings are a reasonable way to reach an orderly resolution of tens of thousands of individual cases.

Along these lines, courts have upheld similar bellwether arbitration clauses. In *Ruiz v. CarMax Auto Superstores, Inc.*, the agreement's "Mass Arbitration Protocol" required "similar claims to proceed in batches of ten." 2024 WL 1136332, *6 (C.D. Cal. Jan. 18, 2024). Because the Protocol "provide[d] for the tolling of any applicable statute of limitations," the court held that it "constitutes a system to adjudicate a group of cases with the purpose of facilitating global or widespread resolution," and so "is not substantively unconscionable." *Id.* For this reason, that court deemed a prior case invalidating a mass-arbitration clause "inapposite," explaining that the prior case addressed a bellwether clause that "contained 'no

23

tolling provision,'" which "created a 'risk that claims w[ould] be effectively barred when coupled with the statute of limitations.'" *Id.*[28]

And at least one other court has agreed that a "staging procedure" for mass claims is not "substantively unconscionable" under California law when the agreement "tolls the applicable statute of limitations" for consumers waiting to arbitrate. *Brooks v. WarnerMedia Direct, LLC*, 2024 WL 3330305, *17-18 (S.D.N.Y. July 8, 2024).

In sum, the district court misapplied California unconscionability law. Although that standard requires courts to consider the practical realities that might justify the inclusion of the challenged contract term, *see*, *e.g.*, *George*, 71 Cal. App. 5th at 630, the court below entirely ignored why a bellwether clause is commercially reasonable here. That clause prevents agreements for individual arbitration from being weaponized through abusive mass arbitrations into a vehicle for extracting blackmail settlements. Bellwether clauses thus preserve the feasibility of individual arbitration, ensuring that all parties continue to enjoy its

---

[28] *See MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024 (N.D. Cal. 2022), *appeal dismissed by agreement*, 2024 WL 5290897 (9th Cir. Oct. 3, 2024).

benefits. The court's disregard of the rationale for bellwether clauses was by itself reversible error.

## B. The District Court's Other Criticisms Of Resolving Mass Arbitrations Through Staged Proceedings Are Without Merit.

The district court misconstrued California's unconscionability law in other respects that also warrant reversal.

### 1. The bellwether process does not unduly delay resolution.

To begin with, the district court's concerns about "delay" from staged bellwether proceedings were misguided. The district court determined the bellwether clause was unconscionable based on the incorrect assumption that the bellwether process would excessively "delay" claim resolutions and so "chill" claims. 1-ER-6; 1-ER-12. In so doing, the district court improperly excused Plaintiffs from their burden to prove delay or any other basis for arguing unconscionability. *Lim v. Tforce Logistics, LLC*, 8 F.4th 992, 999 (9th Cir. 2021) ("[T]he party opposing arbitration bears the burden of proving any defense, such as unconscionability."); *Aggarwal v. Coinbase*, 685 F. Supp. 3d 867, 880 (N.D. Cal. 2023) (same). Yet, neither Plaintiffs nor the district court cited any evidence of actual delay.

25

The district court compounded this shortcoming by misapplying *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79 (2000). 1-ER-14. *Green Tree* held that the "risk" that plaintiff might incur prohibitive arbitration costs absent proof of those costs was too speculative to justify invalidating the arbitration agreement. *Id.* at 91. The same is true here regarding the risk of delay or any chilling effect. Plaintiffs did not proffer any evidence establishing that AviaGames' bellwether procedures would cause undue delay or any chilling effect to resolution of their claims. Instead, the district court impermissibly filled in this gap for Plaintiffs by simply assuming that delay—and a chilling effect—were "likely." 1-ER-11.

More importantly, the district court's speculation about delay rests on a faulty premise—that bellwether proceedings are slower than any real-world alternatives for trying individual cases. Indeed, the court failed to consider the practical realities of adjudicating mass individual claims—whether in court or arbitration. Not even the largest arbitration providers can simultaneously arbitrate one thousand cases—or tens or hundreds of thousands of cases. Under the AAA rules that would otherwise apply, the AAA assigns all cases to a modest roster of

26

arbitrators, who then hear each claim individually.[29] The cases would not be tried all at once; instead, they too would be staged, just as they are under AviaGames's more orderly bellwether process—and just as individual mass tort cases would be staged in court. Because bellwether proceedings promote settlement, they actually encourage resolution of the vast majority of claims in a reasonable time frame.[30] As noted above, only 3% of cases in an MDL are remanded back to the original court, much less reach trial.[31]

By contrast, under AviaGames's process, claims that cannot be settled are assigned to arbitrators 20 at a time (10 are chosen per side), which is likely the most that a single plaintiffs' firm can handle at once. And arbitrators will then resolve the claims faster than courts could try

---

[29] AAA, Mass Arbitration Supplementary Rules, *supra*, at MA-7(c) ("[I]f the number of individual cases exceeds the number of qualified arbitrators in the locale . . ., the AAA[] may assign multiple cases to a single Merits Arbitrator, who will decide each case on its own merits.").

[30] Indeed, reports regarding mass arbitrations suggest that large mass arbitrations generally do not have hearings in every case; instead, parties try at most a few test cases, and then the remaining cases are settled or withdrawn. *See, e.g.*, Matthew C. Helland, *Costs of Defense in Mass Individual Wage-and-Hour Arbitrations: A Case Study*, PLI Current Vol. 3, No. 1 at 215-16, 218 (Winter 2019) (reporting that mass arbitration settled after arbitrating five test cases).

[31] *See* note 26, *supra*.

them, not least because arbitration is "faster than litigation." *Allied-Bruce Terminix*, 513 U.S. at 280 (quotation omitted); *see also Epic Sys.*, 584 U.S. at 505 ("[I]n Congress's judgment[,] arbitration" offers "quicker . . . resolutions for everyone involved" than "courts.").

### 2. The bellwether provision's lack of mutuality is not unconscionable.

Finally, the district court incorrectly criticized the bellwether provision for being non-mutual. 1-ER-20-21. Mass arbitrations—like class actions—are by definition brought by consumers against a company and not the other way around. Yet the law is clear that arbitration agreements precluding class proceedings are enforceable. *Concepcion*, 563 U.S. 333. Simply put, the fact that mass arbitration is a one-sided phenomenon does not and cannot mean that California law forbids companies from addressing it. To the contrary, California law does not require point-by-point mutuality of all contract terms. *See, e.g., Sanchez v. Valencia Holding Co., LLC*, 353 P.3d 741, 749 (Cal. 2015) (contract can provide "extra protection" to drafter). Accordingly, the bellwether provision is not unconscionable on these grounds.

## C. The FAA Preempts Plaintiffs' Unconscionability Challenge.

Even if the district court had properly found AviaGames's bellwether clause unconscionable under California law, the FAA would preempt that state-law holding for two reasons.

First, "the FAA . . . preempts any state law rule discriminating on its face against arbitration," *Kindred*, 581 U.S. at 251, and the district court's unconscionability rule against bellwether clauses has been invented solely for arbitration agreements. *See Oblix, Inc. v. Winiecki*, 374 F.3d 488, 492 (7th Cir. 2004) (FAA forbids states from applying "any novel rule" to invalidate "arbitration agreements"). California does not deem MDL processes unconscionable in court; indeed, California imposes its own similar process, called Judicial Council Coordination Proceedings, in state courts. *See* Cal. R. Ct. 3.501-50. California therefore cannot adopt an "arbitration-specific" rule against MDL processes in arbitration. *Kindred*, 581 U.S. at 254.

Second, the district court's state-law rule obstructs "the full purposes and objectives of Congress" in enacting the FAA—which was to "ensure the enforcement of arbitration agreements according to their terms" and "to promote arbitration." *Concepcion*, 563 U.S. at 344-45, 352.

29

The district court's rule improperly strips parties of their "discretion in designing arbitration processes" that are "tailored to the type of dispute." *Id.* at 344-45. And by forcing companies to subject themselves to unrestricted mass arbitrations (and attendant merits-free blackmail settlements), that state-law rule would impermissibly deter companies from entering into arbitration agreements. *See id.* at 352.

## II. The Bellwether Clause Does Not Offend *Heckman.*

Plaintiffs doubtless will argue that the ruling below may be affirmed on the alternative ground that AviaGames's arbitration clause is unconscionable under this Court's recent decision in *Heckman*. But that argument is wrong. AviaGames's arbitration clause is fully enforceable under *Heckman*, even if *Heckman* was correctly decided.

### A. *Heckman*'s Unconscionability Holding Is Wholly Distinguishable.

*Heckman* declared unconscionable a *sui generis* Ticketmaster arbitration clause that selected a newly created arbitration administrator (New Era) and adopted that administrator's rules. The Ninth Circuit's unconscionability holding rested on the court's understanding of four aspects of Ticketmaster's and New Era's process— and all four are absent here:

30

***Preclusive effect***: The New Era rules called for a handful of bellwether arbitrations to proceed before other arbitrations. But the Ninth Circuit held that the bellwether case outcomes, which the New Era rules deemed to be "precedent," were "binding on the plaintiffs in all of the batched non-bellwether cases," even though they had no "notice" of them, could not "be heard in" them, and had no "right to opt out" of their precedential effect. *Heckman*, 120 F.4th at 684. By contrast, the AviaGames provision does not grant bellwether rulings any preclusive effect on later cases.

***Discovery, evidence, and briefing limits***: Ticketmaster's clause incorporated what the Ninth Circuit characterized as New Era's "absurd" arbitration rules giving claimants "no right to discovery," limiting evidence to "10 documents," and allowing only "five pages" of closing argument. *Heckman*, 104 F.4th at 685. But AviaGames's provision incorporates the rules of the AAA, which the *Heckman* court emphasized "differ significantly from the rules" of New Era. *Id.* at 678. The AAA's rules do not limit evidence or briefing. *See* AAA, Consumer Arbitration Rules (Sept. 1, 2020), https://bit.ly/3Pgs6pJ. And courts have rejected arguments that the *AAA's* discovery rules (which give arbitrators

31

discretion to allow significant discovery) are unfair to consumers. *See, e.g.*, *Surkhabi v. Tesla, Inc.*, 2022 WL 19569540, at *5 (C.D. Cal. Oct. 27, 2022); *Scott v. AT&T Inc.*, 2021 WL 2839959, at *6 (N.D. Cal. Feb. 16, 2021).

***One-sided appeal***: Ticketmaster's clause allowed the company, but not the consumer, to appeal certain arbitral awards. *Heckman*, 104 F.4th at 686. No such provision exists in the AviaGames agreement; the company cannot appeal awards.

***Arbitrator selection***: New Era's rules purported to override a California law allowing each claimant to disqualify an arbitrator. *Heckman*, 104 F.4th at 687. Here, Rule 19 of the AAA's rules permit claimants to invoke "any grounds for disqualification provided by applicable law." AAA, Commercial Rule R-19 (disqualification of arbitrator), https://bit.ly/3Pgs6pJ.

\* \* \*

In other words, none of the features that led this Court to declare Live Nation's arbitration provision unconscionable in *Heckman* is present in AviaGames's arbitration clause.

32

**B.    The    Bellwether    Provision    Is    Compatible    With    *Heckman*'s Alternative Holding.**

*Heckman* also relied on an alternative ground for invalidating Ticketmaster's arbitration clause, but that ground is inapplicable here. The court held that New Era's particular form of "aggregative arbitration" is "not arbitration as envisioned by the FAA," because it is not "bilateral" and "individualized." 104 F.4th at 689-90. Instead, all "common issues" are "treated in a 'class or representative' fashion" by being decided in bellwether rulings that are "binding on non-bellwether plaintiffs, who had no chance to participate in the arbitration and who are ignorant of the decision until it is invoked against them." *Id.* at 679, 683. Because, according to the *Heckman* court, the FAA "does not apply to" the "use of aggregation in arbitration," the FAA does not "protect" Ticketmaster's arbitration clause from California's rule banning class waivers in arbitration agreements. *Id.* at 689-90 (citing *Discover Bank v. Super. Ct.*, 113 P.3d 1100 (Cal. 2005)).

That alternative holding does not apply to AviaGames's clause, which does not use a similar representative process (according bellwether decisions preclusive effect) for mass arbitrations. Instead, AviaGames's clause requires traditional individual arbitration for all claims that are

33

not settled, and is clear that bellwether rulings have no preclusive effect—the exact opposite of the approach to arbitral "precedent" deemed improper in *Heckman*. Indeed, the *Heckman* court emphasized that "New Era's Rules . . . differ significantly from the rules of traditional arbitration fora such as . . . the American Arbitration Association"— which are the rules employed by AviaGames. 120 F.4th at 678. Thus, the FAA continues to apply here and preempts *Discover Bank*.[32]

---

[32] The Supreme Court in *Concepcion* held the *Discover Bank* rule preempted by the FAA. 563 U.S. at 351. The Chamber respectfully submits that *Heckman*'s alternative holding is inapplicable here for the additional reason that it contravenes U.S. Supreme Court precedent. In *Concepcion*, the Supreme Court explained that "[p]arties *could* agree to arbitrate pursuant to the Federal Rules of Civil Procedure, or pursuant to a discovery process rivaling that in litigation," or even to "aggregation." 563 U.S. at 351. Although these types of arbitration are "not arbitration as envisioned by the FAA," the Court declared that "[a]rbitration is a matter of contract, and the FAA requires courts to honor parties' expectations." *Id.* Similarly, in *Lamps Plus, Inc. v. Varela*, the Court acknowledged that "[c]lass arbitration lacks th[e] benefits" of the "individualized form of arbitration envisioned by the FAA," but nonetheless concluded that, under the FAA, courts can compel "class arbitration" when there is an "affirmative contractual basis for concluding that the part[ies] *agreed* to do so." 587 U.S. 176, 185 (2019). To be sure, the FAA forbids states from requiring these procedures when an arbitration agreement provides otherwise. But *Heckman* misread that protection of party autonomy as withdrawing FAA protection from agreements that adopt those procedures.

## CONCLUSION

This Court should reverse the district court's order denying AviaGames's motion to compel arbitration.

Dated: January 22, 2025                    Respectfully submitted,

                                           /s/ *Andrew J. Pincus*
Jennifer B. Dickey                         Andrew J. Pincus
Jonathan D. Urick                          Archis A. Parasharami
U.S. CHAMBER LITIGATION                     Kevin S. Ranlett
   CENTER                              Jennifer L. Weinberg
1615 H Street, N.W.                        MAYER BROWN LLP
Washington, DC 20062                       1999 K Street, N.W.
                                           Washington, DC 20006
                                           (202) 263-3000
                                           apincus@mayerbrown.com


*Counsel for* Amicus Curiae *the Chamber of Commerce
of the United States of America*

35

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    **9th Cir. Case Number(s)**   No. 24-5817

I am the attorney or self-represented party.

**This brief contains** <u>6,912</u> **words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  <u>/s/ *Andrew J. Pincus*</u> **Date** <u>January 22, 2025</u>