No. 24-5817

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

ANDREW PANDOLFI and MANDI SHAWCROFT,
individually and on behalf of all others similarly situated,
*Plaintiffs-Appellees*,

v.

AVIAGAMES, INC.; VICKIE YANJUAN CHEN; and PING WANG,
*Defendants-Appellants*.

On Appeal from the United States District Court
for the Northern District of California, No. 3:23-cv-05971
Hon. Edward M. Chen, United States District Judge

## BRIEF OF AMICUS CURIAE PUBLIC CITIZEN IN SUPPORT OF
## PLAINTIFFS-APPELLEES AND AFFIRMANCE

Nicolas A. Sansone
Karla Gilbride
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Attorneys for Amicus Curiae*

March 24, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, amicus curiae Public Citizen states that it is a non-stock, nonprofit corporation. It has no parent corporation, and no publicly held corporation owns 10 percent or more of Public Citizen.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................ i

TABLE OF AUTHORITIES ................................................................. iii

INTEREST OF AMICUS CURIAE ........................................................ 1

SUMMARY OF ARGUMENT ............................................................... 2

ARGUMENT .................................................................................. 4

    Avia's arbitration-batching provision is substantively
    unconscionable under California law. .......................................... 4

CONCLUSION ................................................................................ 22

CERTIFICATE OF COMPLIANCE ...................................................... 24

CERTIFICATE OF SERVICE .............................................................. 25

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*America Online, Inc. v. Superior Court*,
108 Cal. Rptr. 2d 699 (Ct. App. 2001)....................................................8

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) ....................................................9, 16, 20

*Beynon v. Garden Grove Medical Group*,
161 Cal. Rptr. 146 (Ct. App. 1980)........................................................7

*Briggs v. Merck Sharp & Dohme*,
796 F.3d 1038 (9th Cir. 2015) ............................................................11

*Cisneros Alvarez v. Altamed Health Services Corp.*,
274 Cal. Rptr. 3d 802 (Ct. App. 2021)....................................................7

*Comb v. PayPal, Inc.*,
218 F. Supp. 2d 1165 (N.D. Cal. 2002) ..................................................8

*Epic Systems Corp. v. Lewis*,
584 U.S. 497 (2018) ............................................................19

*Green Tree Financial Corp.-Alabama v. Randolph*,
531 U.S. 79 (2000) ........................................................14, 15

*Heckman v. Live Nation Entertainment, Inc.*,
120 F.4th 670 (9th Cir. 2024)........................................................21, 22

*In re 3M Combat Arms Earplug Products Liability Litigation*,
No. 8:20-cv-97300, 2022 WL 3345969 (N.D. Fla. Aug. 14, 2022) ........15

*In re Lipitor*,
No. 18-cv-01725, 2018 WL 2150942 (C.D. Cal. May 10, 2018)......11, 15

*Little v. Auto Stiegler, Inc.*,
63 P.3d 979 (Cal. 2003) ....................................................7, 8

*Lyle v. Superior Court*,
    175 Cal. Rptr. 918 (Ct. App. 1981) ........................................................9

*McGrath v. DoorDash, Inc.*,
    No. 19-cv-05279, 2020 WL 6526129 (N.D. Cal. Nov. 5, 2020) ............12

*Nagrampa v. MailCoups, Inc.*,
    469 F.3d 1257 (9th Cir. 2006) .............................................................7

*People ex rel. Department of Corps. v. SpeeDee Oil Change Systems, Inc.*,
    980 P.2d 371 (Cal. 1999) .....................................................................9

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) .............................................................................8

*ReliaStar Life Insurance Co. of New York v. EMC National Life Co.*,
    564 F.3d 81 (2d Cir. 2009) .................................................................18

*Saika v. Gold*,
    56 Cal. Rptr. 2d 922 (Ct. App. 1996) .................................................7

*Seagate Technology, LLC v. Western Digital Corp.*,
    854 N.W.2d 750 (Minn. 2014) ...........................................................18

*Sonic-Calabasas A, Inc. v. Moreno*,
    311 P.3d 184 (Cal. 2013) ...................................................................20

**Statutes**

28 U.S.C. § 1407(a) ..................................................................................15

**Other Authorities**

American Arbitration Ass'n,
    *2023 Consumer Arbitration Statistics* (2024) ...................................5

American Arbitration Ass'n,
    *Supplementary Rules for Multiple Case Filings* (Aug. 1, 2021) ..........16

Vickie Yanjuan Chen, *2022: Reflecting on Five Years of AviaGames*,
LinkedIn (Dec. 22, 2022) ........................................................6

Eldon E. Fallon et al., *Bellwether Trials in Multidistrict Litigation*,
82 Tul. L. Rev. 2323 (2008) ................................................11

J. Maria Glover, *Mass Arbitration*,
74 Stan. L. Rev. 1283 (2022) ..........................................9, 18

## INTEREST OF AMICUS CURIAE[1]

Public Citizen, a nonprofit consumer advocacy organization with members in all fifty states, appears before Congress, administrative agencies, and courts to advocate for the enactment and enforcement of laws protecting consumers, workers, and the public. Public Citizen has a longstanding interest in issues concerning the enforcement of mandatory pre-dispute arbitration agreements, and it has appeared as amicus curiae in many cases presenting those issues. *See, e.g.*, *New Prime Inc. v. Oliveira*, 586 U.S. 105 (2019); *McGill v. Citibank, N.A.*, 393 P.3d 85 (Cal. 2017). Particularly relevant here, Public Citizen has previously appeared as amicus curiae before this Court to explain the unconscionability of arbitration provisions that require small batches of individual claims to be arbitrated consecutively, potentially creating years' worth of delay and chilling plaintiffs from challenging corporate practices that inflict individual injuries on large numbers of consumers. *See MacClelland v. Cellco P'ship*, No. 22-16020, 2024 WL 5290897 (9th Cir. Oct. 3, 2024).

---

[1] This brief was not authored in whole or part by counsel for a party, and no one other than amicus curiae or its counsel made a monetary contribution to the preparation or submission of the brief. Counsel for all parties have consented to its filing.

## SUMMARY OF ARGUMENT

Under a contractual provision drafted by Appellant AviaGames, Inc. (Avia), if twenty-five or more customers file similar legal claims against Avia, the customers' claims must be arbitrated in consecutive, twenty-case batches. As the district court correctly held, this provision is substantively unconscionable under California law. By its terms, the provision unreasonably impedes resolution of claims arising from misconduct that injures large numbers of customers. The more customers Avia injures, the longer the queue of twenty-case batches will stretch, and the longer all but a lucky few customers will wait for relief—assuming that the delay does not deter them from pursuing their claims.

Contrary to the contention of Avia and its amicus curiae Chamber of Commerce of the United States (the Chamber), the batching provision is not justified as a sensible case-management strategy for situations where a company's conduct prompts a large number of individual claims in arbitration. Courts and arbitral bodies have developed mechanisms for efficiently managing a large volume of claims without sacrificing consumers' right to attain prompt adjudication. Under multidistrict litigation procedures that apply in federal court, for example, individual

cases can be consolidated before a single judge for pretrial proceedings and then remanded to their originating courts for trial, perhaps after a handful of "bellwether" test cases have been tried to conclusion to inform settlement talks. Avia's batching procedure does not resemble this process. Rather than consolidating individual cases for resolution of preliminary matters, Avia's procedure divides each twenty-case batch among twenty different arbitrators. Rather than allowing every case to proceed promptly after an initial bellwether period, Avia's procedure bars every other case from proceeding until every case in every prior batch has concluded—which could take years or even decades. And rather than informing a fair settlement, the delays built into Avia's procedure distort settlement incentives to Avia's advantage.

Meanwhile, the Chamber's suggestion that "mass arbitration" is somehow unfair to defendants blinks reality. When a single corporate practice causes widespread individual injury, the result will be a large number of individual claims. Companies can include any number of lawful provisions in their consumer contracts to dictate the forum that will hear those claims and the procedures that will be used to resolve them. What companies *cannot* do under California law is enforce a

provision that unconscionably delays resolution of consumer claims in any forum at all.

## ARGUMENT

### Avia's arbitration-batching provision is substantively unconscionable under California law.

**A.** The arbitration provision that Avia seeks to enforce requires individual arbitration of customers' legal claims but imposes a rigid framework that largely bars twenty-five or more customers whose injuries arise out of the same corporate practice from arbitrating at any one time. Specifically, the agreement directs that if twenty-five or more "similar claims" are filed against Avia in arbitration by the same or coordinated counsel, or are "otherwise coordinated," only twenty cases can proceed at one time, all before different arbitrators. 1-ER-5. The other cases "shall be deemed filed" but shall not "proceed" until each of the arbitrators has decided each of the twenty initial cases. *Id.* Once each of the twenty cases in the first batch has concluded, another twenty cases may proceed. *Id.* After every case in the second batch is resolved, another twenty consumers may have their cases heard. *Id.* This sequence of twenty-case batches continues until every case has been "adjudicated or otherwise resolved." *Id.* By rationing dispute resolution and forcing most

4

aggrieved consumers with similar claims to wait indefinitely for their day in arbitration, Avia's batching provision penalizes consumers who have suffered an individual injury as a result of a common corporate practice.

The district court correctly rejected Avia's contention that the batching provision "promotes efficiency" in managing large numbers of individual claims. Avia Br. 67; *see* 1-ER-11–12. Avia's own amicus observes that the sort of cases covered by the batching provision, where many consumers invoke their right to pursue similar claims through individual arbitration, can involve tens of thousands of injured consumers. *See* Chamber Br. 12. Meanwhile, statistics from the American Arbitration Association reflect that the median time for a claim to proceed from filing to judgment in arbitration was 9.6 months in 2023. *See* Am. Arbitration Ass'n, *2023 Consumer Arbitration Statistics* (2024).[2] Even on the unrealistic assumption that no arbitration in any batch runs longer than the median, Avia's batching provision would require a group of just 1,000 customers with similar claims to have their cases heard in fifty consecutive twenty-case batches, each lasting around 9.6 months—

---

[2] https://adr.org/sites/default/files/document_repository/AAA454-2023_Consumer_Infographic.pdf.

meaning that it would take up to *forty years* for some consumers' claims to be resolved. Given Avia's millions-strong user base, an unlawful corporate practice could easily injure groups at least this size, if not larger. *See* Vickie Yanjuan Chen, *2022: Reflecting on Five Years of AviaGames*, LinkedIn (Dec. 22, 2022) (statement from Avia's founder and CEO boasting of Avia's "base of more than 23 million users" in 2022).[3]

Making matters worse, a single outlier case that takes longer than average to resolve could delay this timeline considerably, because the batching provision bars a new twenty-case batch from proceeding until *every* case in the preceding batch has concluded. *See* 1-ER-5. The potential for such case-specific delays, moreover, is increased by a provision in Avia's arbitration agreement that allows Avia to insist that every case within each twenty-case batch be decided by a different arbitrator. *See id.* ("Only one case may be assigned to each arbitrator … unless the parties agree otherwise."). As the district court recognized, *see* 1-ER-11 & n.3, this provision creates inefficiencies by impeding the consolidation of the cases within each batch.

---

[3]      https://www.linkedin.com/pulse/2022-reflecting-five-years-aviagames-vickie-yanjuan-chen.

6

The extended delays built into the arbitration-batching provision's procedural framework withhold the promise of timely resolution for many Avia customers and render the provision substantively unconscionable. *See, e.g.*, *Cisneros Alvarez v. Altamed Health Servs. Corp.*, 274 Cal. Rptr. 3d 802, 820 (Ct. App. 2021) (citing the "delay associated with procedures which potentially stood between a plaintiff … and the confirmation of his or her award" as contributing to unconscionability); *Saika v. Gold*, 56 Cal. Rptr. 2d 922, 925 (Ct. App. 1996) (explaining that the imposition of time-consuming procedures can be unconscionable even if they only "*incrementally* increase[] expense and delay"), *cited in Little v. Auto Stiegler, Inc.*, 63 P.3d 979, 984 (Cal. 2003). Indeed, when large numbers of customers are aggrieved, Avia's batching provision could discourage, if not "effectively preclud[e]," many of them "from asserting any claims against [Avia]" in the first place by pushing off any hope of recovery for years or decades. *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1288 (9th Cir. 2006) (en banc) (discussing a forum-selection clause); *see Beynon v. Garden Grove Med. Grp.*, 161 Cal. Rptr. 146, 150 (Ct. App. 1980) (declining to enforce a contract term imposed by a party with superior bargaining strength that could "render

arbitration an expensive and protracted proceeding"), *cited in Little*, 63 P.3d at 984.

That result is impermissible under California law. *See Comb v. PayPal, Inc.*, 218 F. Supp. 2d 1165, 1177 (N.D. Cal. 2002) (holding an arbitration agreement unconscionable where its features aimed at "shield[ing]" the drafting party "from liability instead of providing a neutral forum in which to arbitrate disputes"); *cf. Am. Online, Inc. v. Superior Ct.*, 108 Cal. Rptr. 2d 699, 708 (Ct. App. 2001) (noting that "California courts will refuse" to enforce a contractual forum-selection clause that "would substantially diminish" a party's substantive rights).

**B.** That coordinated legal representation triggers Avia's delay-inducing batching provision underscores the risk that the provision will deter consumers from asserting their rights. Where a lawsuit targets practices that have inflicted widespread but low-dollar financial injuries, attorneys may be unable to offer representation unless they can take on enough individual claims to benefit from economies of scale, so that the total expected recovery outweighs the litigation costs. *Cf. Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 809 (1985) (recognizing the economic logic behind "pool[ing] claims which would be uneconomical to litigate

8

individually"); J. Maria Glover, *Mass Arbitration*, 74 Stan. L. Rev. 1283, 1307 (2022) (explaining that "consumer-fraud claims," like those asserted here, "tend to gain viability from aggregation").

To be sure, the Supreme Court has held that the Federal Arbitration Act (FAA) preempts state-law rules that require the economic efficiencies of *class-action* procedures to be available in arbitration. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 347–52 (2011). Class actions, though, adjudicate the claims of absent parties and so require special procedural protections that the Court held to be inconsistent with arbitration's informal nature. *See id.* at 349–50. Avia's batching provision, in contrast, inhibits consumers who pursue only *their own* rights in individual, bilateral arbitration from retaining counsel who are handling similar claims and who therefore may be able to manage individual cases more efficiently and at lower cost. This interference with consumers' "important right to counsel of [their] choice" heightens the batching provision's substantive unconscionability. *People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*, 980 P.2d 371, 378 (Cal. 1999); *see Lyle v. Super. Ct.*, 175 Cal. Rptr. 918, 925 (Ct. App. 1981) (noting a civil litigant's interest in "avoiding inconvenience and duplicative

expense" by retaining counsel "already thoroughly familiar with the case"). After all, customers with low-dollar claims may rationally opt not to pursue their claims at all if they cannot retain an attorney who can offer cost-effective representation—or if retaining cost-effective representation will trigger delays caused by Avia's batching provision.

**C.** Avia's chief defense of the arbitration-batching provision rests on a mischaracterization of how it functions. Avia—amplified by the Chamber—equates the provision to the "bellwether process … routinely used in federal courts and multidistrict litigations." Avia Br. 68; *see* Chamber Br. 4 (claiming that Avia's batching process is "simply borrow[ed] … from the federal courts"). In a sleight-of-hand, Avia and the Chamber then defend the provision, not on its own terms, but by explaining the benefits of the judicial bellwether process it supposedly replicates. *See* Avia Br. 67–68; Chamber Br. 18–25. But whatever the merits of a true bellwether system, in which some representative cases precede others to trial so as to give the parties predictive insight into the value of the remaining plaintiffs' claims and to facilitate settlement, Avia's batching provision does not create such a system. Instead, Avia's

system forces substantial delays that Avia can leverage to avoid ever having to resolve large numbers of claims at all.

In a bellwether system, the parties try one or more "test case[s]" to conclusion, after which plaintiffs who do not settle their claims can proceed to trial. *Briggs v. Merck Sharp & Dohme*, 796 F.3d 1038, 1051 (9th Cir. 2015); *see* Eldon E. Fallon et al., *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323, 2339 (2008) (explaining that bellwether trials enable attorneys to compile evidentiary materials for use by "litigants and local counsel" when "individual cases" go to trial following the bellwether process). As a judge presiding over a coordinated proceeding in California state court has explained, "[i]f bellwether trials … are unsuccessful in guiding the parties to … settlements, it has always been clear … that the coordination trial judge will have to remand cases for trial" in their originating courts so as not to "deprive plaintiffs of timely adjudication of their claims." *In re Lipitor*, No. 18-cv-01725, 2018 WL 2150942, at *2 (C.D. Cal. May 10, 2018) (quoting California Superior Court Judge Carolyn Kuhl).

A bellwether procedure thus does not create the delay that Avia's batching provision does. To illustrate, if 100 cases are consolidated in a

bellwether proceeding and twenty are tried as test cases, once the test cases have concluded, the parties to the remaining eighty cases can decide based on information derived from the test cases whether to settle. If thirty of the cases settle, then the remaining fifty will proceed immediately. Courts applying California law have enforced arbitration provisions that approximate this process. *See, e.g.*, *McGrath v. DoorDash, Inc.*, No. 19-cv-05279, 2020 WL 6526129, at *10 (N.D. Cal. Nov. 5, 2020) (noting that an arbitration provision "appear[ed] fair" where, among other things, all customers could proceed with their individual claims after a 210-day process that entailed resolution of a single set of initial test cases and subsequent efforts to mediate the remaining cases).

Contrast the bellwether process with Avia's. Under Avia's system, if 100 arbitrations are filed and trigger the batching provision, twenty cases will be resolved initially, as in the bellwether example above. But the similarity ends there. If thirty cases settle after the initial batch is resolved, the remaining fifty customers do *not* all get to proceed immediately on their individual claims. Rather, only twenty cases may proceed, with the remaining thirty customers powerless to move forward until all twenty cases are resolved. Even at that point, only twenty of the

12

remaining thirty cases may proceed, saddling an unlucky ten customers with still more delay.

The absence of any mechanism by which consumers subject to Avia's batching provision can proceed promptly with their individual claims following a discrete bellwether period belies the Chamber's characterization of Avia's provision as a benign mechanism for promoting settlement. *See* Chamber Br. 18–25. A defendant may have incentive to engage in settlement negotiations when faced with the imminent alternative of litigating a host of individual claims that a bellwether process has shown to be potentially meritorious. But where, as here, a defendant has structured the dispute so that it will face only a trickle of claims each year, it has scant incentive to pursue a fairly valued global settlement resolving large numbers of claims that it knows *cannot* be arbitrated for years or even decades to come. Moreover, against the backdrop of Avia's batching provision, Avia has an artificial advantage with respect to settlement because plaintiffs, in valuing their claims, must factor in the years or decades of delay that the batching provision imposes. And while the Chamber contends that "large mass arbitrations generally" reach a resolution after "at most a few test cases," Chamber

Br. 27 n.30, the litigation discussed in the one study that it cites did not involve an arbitration-batching provision at all—let alone a batching provision that gives the defendant a tool to delay resolution of a large volume of meritorious claims.

The Chamber is also wrong to fault Plaintiffs for "proffer[ing] [no] evidence" that Avia's batching provision "would cause undue delay or any chilling effect" on Avia customers asserting their claims. *Id.* at 26; *see* Avia Br. 53 (characterizing the district court's analysis as "unmoored from the record"). The risk of delay—and the consequent risk of chill—necessarily results from applying the express terms of the batching provision itself. Contrary to Avia's and the Chamber's contentions, then, *see* Avia Br. 51–53; Chamber Br. 26, this case is not like *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79 (2000), where a plaintiff sought to invalidate an arbitration agreement that was "silen[t] on the subject" of costs based on the "speculative" risk that she would incur prohibitive expenses in arbitration, *id.* at 91; *see id.* at 90 n.6 (noting that the record "provide[d] no basis on which to ascertain the actual costs and fees to which [the plaintiff] would be subject in arbitration"). Here, Plaintiffs do not argue that Avia's batching provision

"fails to affirmatively protect [them]" from delay. *Id.* at 82. Rather, the terms of Avia's arbitration agreement—coupled with Avia's obvious economic incentive to evade liability when large numbers of customers assert meritorious claims—make delay inevitable.

The Chamber attempts to minimize the significance of this inevitability by alluding to the "practical realities" that create the potential for delay whenever large numbers of claims must work their way through any adjudicatory system. Chamber Br. 26. Established procedural mechanisms, however, have long offered courts the necessary flexibility to manage high-volume litigation efficiently. *See, e.g.*, 28 U.S.C. § 1407(a) (allowing "civil actions involving one or more common questions of fact" to be consolidated for joint pretrial proceedings before being remanded to the originating courts for individual trials); *In re Lipitor*, 2018 WL 2150942, at *2 (describing a similar system for mass actions in California state court); *see also, e.g.*, *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 8:20-cv-97300, 2022 WL 3345969, at *1 (N.D. Fla. Aug. 14, 2022) (describing a process by which nearly 300,000 individual cases were organized into 500-case waves in preparation for trial). Bilateral arbitral proceedings, meanwhile, present similar

opportunities for adaptation, characterized as they are by "informality" that "allow[s] for efficient, streamlined procedures tailored to the type of dispute." *Concepcion*, 563 U.S. at 344–45. Arbitral bodies have recognized those opportunities, recommending case-management measures parties can adopt to facilitate efficient resolution of large numbers of similar claims. *See, e.g.*, Am. Arbitration Ass'n, *Supplementary Rules for Multiple Case Filings* (Aug. 1, 2021).[4]

Avia has not adopted such efficiency-maximizing tools. Instead, it has opted for a rigid system that guarantees delay. *See supra* pp. 4–6. Contrary to the Chamber's suggestion, these built-in inefficiencies are not inherent characteristics of court or arbitral proceedings that involve large numbers of claimants. They are deliberate choices that Avia has made to hinder its customers from vindicating their rights in the arbitral forum that Avia selected. As the district court recognized, 1-ER-11–12, this deliberate obstruction of the resolution of consumer claims—whether in court or in arbitration—is substantively unconscionable.

---

[4] https://www.adr.org/sites/default/files/Supplementary_Rules_Mu ltipleCase_Filings.pdf.

**D.** Finally, the Chamber devotes much of its brief to decrying what it views as "the rise of … abusive mass arbitrations," in which large numbers of plaintiffs pursue similar claims in individual arbitration. Chamber Br. 9; *see id.* at 9–18. The Chamber, though, cannot dispute that customers have a right to assert legal claims challenging Avia's allegedly unlawful practices and that any resulting expenses are a consequence of the arbitration agreement that *Avia* drafted and the forum that *Avia* selected to resolve consumer claims. It was Avia that chose to prohibit customers from filing claims in court as a class action or from pursuing class arbitration, where challenges to an allegedly unlawful practice affecting many consumers could likely be resolved in a single proceeding. Having required customers to pursue individual arbitrations, Avia and the Chamber cannot reasonably point to the economic consequences of *Avia's choice* to justify the batching provision.

The Chamber's concern that plaintiffs will try to extract "blackmail settlements" of meritless claims by "push[ing] … arbitration fees to astronomical levels," *id.* at 12, is similarly misguided. Despite acknowledging that "rules of professional conduct" require attorneys to "vet[] their clients to ensure that they have a basis for presenting an

arbitral claim," and without suggesting that Plaintiffs' attorneys here have failed to take this mandatory step, the Chamber assumes that attorneys will regularly fail to comply with their professional obligations. *Id.* at 13. The Chamber does not explain why existing disciplinary mechanisms are insufficient to police attorneys who engage in misconduct in arbitration. *See, e.g.*, *ReliaStar Life Ins. Co. of N.Y. v. EMC Nat'l Life Co.*, 564 F.3d 81, 86–87 (2d Cir. 2009) (noting widespread judicial recognition that arbitrators have broad authority to fashion remedies and impose sanctions, provided that such authority is consistent with the terms of the parties' underlying arbitration agreement); *Seagate Tech., LLC v. W. Digital Corp.*, 854 N.W.2d 750, 753–54 (Minn. 2014) (affirming an arbitrator's imposition of sanctions that contributed to an award of more than $500 million against the sanctioned party).

This Court should decline to assume that attorneys will invite financial risk and professional opprobrium by pursuing meritless claims en masse. *See* Glover, *Mass Arbitration*, 74 Stan. L. Rev. at 1328–38 (describing the "substantial startup costs" that make arbitrating a sizeable group of similar cases "an expensive and therefore risky

proposition" for plaintiffs' lawyers, even if the defendant reimburses filing fees). Rather, large numbers of similar arbitration demands are the inevitable consequence when large numbers of consumers who have been injured by a common business practice are contractually required to pursue a remedy in individual bilateral arbitral proceedings and have succeeded in the difficult task of finding attorneys willing to represent them in those proceedings. If companies like Avia are dissatisfied with the forum into which contracts of their own creation have directed their customers' claims, the companies' solution cannot permissibly be to impose inflexible procedural hurdles that hold those claims in extended limbo, unable for years to advance in *any* forum.

Because the batching provision that Avia drafted sacrifices precisely "the virtues Congress originally saw in arbitration, its speed and simplicity and inexpensiveness," *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 509 (2018), Avia cannot credibly claim that it was pursuing those benefits when it required its customers to forgo the efficiencies of aggregate litigation in favor of individual bilateral arbitration. Rather, the difficulties that the batching provision raises for customers who seek to assert claims arising from practices that have similarly harmed many

other people suggest that the provision's true aim is to minimize the number of such claims that are brought (or resolved) at all. Given the mismatch between Avia's batching procedure and the efficiencies of traditional bilateral arbitration, it is no surprise that Avia does not argue that the FAA preempts application of the state-law substantive unconscionability principles on which the district court relied.

Although the Chamber briefly argues that invalidating the batching provision as substantively unconscionable "obstructs" arbitration, Chamber Br. 29, the Chamber gets things backwards.[5] After all, Avia, not its customers, has attempted to "interfere[] with fundamental attributes of arbitration" by deterring and delaying resolution of consumer claims. *Concepcion*, 563 U.S. at 344; *see also Sonic-Calabasas A, Inc. v. Moreno*, 311 P.3d 184, 199 (Cal. 2013) (observing that procedures that "cause[] arbitration to be substantially delayed … interfere[] with a fundamental attribute of arbitration"). The

---

[5] The Chamber also argues that the district court impermissibly adopted an "arbitration-specific" rule by holding that the sort of bellwether process that courts regularly employ becomes unconscionable when it is used in arbitration. Chamber Br. 29. As explained above, though, *see supra* pp. 10–14, Avia's batching provision does not capture the efficiencies of judicial (or arbitral) bellwether proceedings but instead obstructs the prompt resolution of claims.

district court's holding, in contrast, *effectuates* the FAA's purposes by prohibiting an arbitration agreement from imposing procedural obstacles that impede the prompt and efficient resolution of consumer claims in individual bilateral arbitration.

Indeed, this Court has rejected the argument that the FAA applies to schemes like Avia's in the first place. As Judge VanDyke wrote, a scheme that "includes 'bellwether cases' and 'batch proceedings[]' is an entirely new form of dispute resolution *intentionally designed* to avoid individual, bilateral adjudication of claims—exactly the attributes of arbitration the Supreme Court in *Concepcion* recognized that the FAA protects." *Heckman v. Live Nation Entm't, Inc.*, 120 F.4th 670, 692 (9th Cir. 2024) (VanDyke, J., concurring in the judgment); *see id.* at 689 (majority opinion) ("agree[ing] with" Judge VanDyke's concurrence and holding as "an alternate and independent ground" that "the FAA simply does not apply to and protect [a] mass arbitration model" with such features). Avia and the Chamber argue that *Heckman*'s holding does not apply here because under Avia's batching procedure "bellwether rulings have no preclusive effect." Chamber Br. 34; *see* Avia Br. 38 n.2. In *Heckman*, though, the defendant maintained that "the arbitrator's

application of 'precedent' from the bellwether cases is completely discretionary." 120 F.4th at 685. This Court nonetheless rejected the defendant's attempt to draw "aggregative arbitration" within the FAA's protections because it was "beyond dispute that it is not arbitration as envisioned by the FAA in 1925." *Id.* at 690.

Like the defendant in *Heckman*, Avia has designed a system that "sacrifices the principal advantage of arbitration—its informality—and makes the process slower, more costly, and more likely to generate procedural morass than final judgment." *Id.* (quoting *Concepcion*, 563 U.S. at 348). The FAA does not protect this deliberately inefficient system, which is substantively unconscionable under California law.

## CONCLUSION

This Court should affirm the district court's judgment.

Respectfully submitted,

/s/ Nicolas A. Sansone
Nicolas A. Sansone
Karla Gilbride
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Attorneys for Amicus Curiae*

March 24, 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and the Rules of this Court, it contains 4,215 words.

This brief also complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 29(a)(4), 32(a)(5), and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

/s/ Nicolas A. Sansone
Nicolas A. Sansone
*Attorney for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Brief of Amicus Curiae with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit on March 24, 2025, using the ACMS e-filing system. I certify that all participants in this case are registered ACMS users and that service will be accomplished by the ACMS system.

/s/ Nicolas A. Sansone
Nicolas A. Sansone
*Attorney for Amicus Curiae*